IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MEL TYRONE EDWARD,　　　　　　　　　No. 2:10-CV-0979-JAM-CMK-P

　　　　Plaintiff,

　　vs.　　　　　　　　　　　　　　　　FINDINGS AND RECOMMENDATIONS

D. SWINGLE, et al.,

　　　　Defendants.

_____/

　　　　Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court are defendants' motions for summary judgment (Docs. 57 and 60).

**I. BACKGROUND**

**A.　　Plaintiff's Allegations**

　　　　This action proceeds on the original complaint against defendants Swingle, Petersen, Hogan, Martin, Medina, and Arnold on plaintiff's Eighth Amendment medical care claims only. He claims that defendants Petersen, Hogan, Martin, and Arnold harassed him "by Cancelling Orthopedic Medical Access Plaintiff needs to maintain Good Health, and be free of

Pain and Suffering, such as Treatments for Pain Management such as Daily Showers and Trigger Point Injections. . . ." Plaintiff states that defendant Medina "rewrote" his medical authorizations and cancelled treatments that had been approved earlier. He adds that such conduct was also approved by defendant Swingle by way of a "CDCR-128 Comprehensive Chrono." Plaintiff adds:

> . . . The same thing was done when Defendant Arnold wanted Plaintiff's Orthopedic access to wear Tennis Shoes changed, all for the purpose of legitimizing a RVR Defendant Arnold wrote against Plaintiff. Also, when Defendant Martin wanted Plaintiff taken off regular Diabetic Treatments, as a result of a CDCR-602 Appeal Grievance Plaintiff Authored against him, and also how he didn't want to Escort Plaintiff to the Facility Clinic Daily for Diabetic Treatments during Lock Downs.

Plaintiff states that defendants Swindle and Medina "went on to Cancel other Medically Necessary Authorizations Plaintiff had prior to Transferring to HDSP, such as Special Diets needed to maintain Diabetic and hypertension Conditions, including a severe Allergy to Peanuts."

### B. The Parties' Evidence

In his motion for summary judgment, defendant Medina contends that the following facts are undisputed:

1. Defendant Medina – a physician's assistant – never breached the standard of care owed to plaintiff.

2. Defendant Medina never left plaintiff exposed to a substantial risk of serious harm.

3. Defendant Medina never knowingly left plaintiff exposed to any substantial risk of serious harm.

4. Defendant Medina did not cause plaintiff to sustain any harm.

5. Other reasonable physician assistants could have considered defendant Medina's conduct constitutional.

According to defendant Medina, these facts are considered admitted under Federal Rule of Civil Procedure 36(a)(3) because plaintiff failed to respond to defendant's requests for admissions on these points.

2

In their separate motion for summary judgment, the remaining defendants assert that the following facts are not in dispute:

General Facts

1. When plaintiff arrived at High Desert State Prison ("HDSP") in January 2008, he was being treated for a variety of chronic conditions, including Type II diabetes, asthma, hypertension, and diabetic neuropathy.

2. At the time of his transfer to HDSP, plaintiff was being prescribed the following medications: ECASA, Naproxen, Metformin, Glipizide, Lisinopril, and Ibuprophen; plaintiff was also being treated with insulin and monitored with glucose checks.

3. These medications/measures were continued at HDSP.

4. While at HDSP, plaintiff was also prescribed Gabapentin, Salsalate, Motrin, and acetaminophen to control pain.

5. Between January 2008 and February 2011, plaintiff did not require treatment with trigger point injections or daily showers.

6. Diagnostic testing during that time, including x-rays and an MRI, did not show any abnormalities.

Showers

7. Based on authorization from his prior prison, plaintiff was permitted by defendant Petersen – a correctional officer in plaintiff's housing unit at HDSP – to shower daily at HDSP, instead of the normal every-other-day schedule, until he could confirm the authorization with HDSP medical staff.

8. Defendant Petersen continued to allow plaintiff to take daily showers through January 2009.

9. In January 2009, plaintiff filed a prison grievance alleging that defendant Petersen had not provided him with a daily shower.

10. During the investigation of that grievance, it was determined that plaintiff never took the necessary steps to have his daily shower accommodation re-authorized by medical staff at HDSP, pursuant to prison policy following a prison transfer.

11. Upon learning that plaintiff did not have a daily shower authorization from HDSP medical staff, defendant Peterson provided plaintiff showers on the normal every-other-day schedule.

///

Shoes

12. Plaintiff arrived at HDSP with a valid accommodation to wear orthopedic boots. That accommodation was renewed at HDSP.

13. In February 2008, plaintiff complained of swelling in his legs and, upon examination, defendant Medina determined that plaintiff had edema, which is an abnormal accumulation of fluid. Plaintiff was treated with Lasix.

14. Defendant Medina continued to see and treat plaintiff for edema through the fall of 2008.

15. On November 24, 2008, plaintiff approached defendant Arnold – a correctional officer – for permission to go to the medical clinic. At the time, plaintiff was wearing tennis shoes. Arnold informed plaintiff that he could not go to the clinic because he was not wearing prison-issue shoes, to which plaintiff stated that the accommodation allowing his to wear orthopedic boots included his tennis shoes because they contained an orthotic insole.

16. Defendant Arnold called the clinic to confirm plaintiff's claim and was instructed by clinic staff that plaintiff had special orthopedic boots and that tennis shoes were not in compliance.

17. Arnold continued to refuse plaintiff access to the medical clinic whereupon plaintiff became belligerent and Arnold issued a rules violation report.

18. On December 12, 2008, defendant Swingle – a prison doctor – issued a comprehensive chrono approving Medina's recommendation that plaintiff be permitted to wear tennis shoes because "his legs [were] too edematous to slip on shoes normally."

19. Following treatment, plaintiff's edema came under control.

20. Plaintiff continued to complain of foot pain and, on May 13, 2010, was referred to a podiatrist who diagnosed plaintiff with mild plantar fasiciitis. The podiatrist provided plaintiff with a nerve block shot. He also determined that plaintiff did not require special orthotic boots to treat foot pain.

Diabetes

21. Plaintiff's blood was checked on March 8, 2008, with an A1c result of 6.6, and again on April 5, 2008, with a result of 7.2.

22. On May 20, 2008, Medina noted that plaintiff's A1c results had increased. Medina ordered daily blood sugar checks with appropriate treatment with insulin on a sliding scale.

23. By October 27, 2008, plaintiff A1c had increased to 8.0, suggesting that his diabetes was becoming less controlled. Medina continued the order for daily blood sugar checks.

24. In December 2008 defendant Martin was the escort officer assigned to escort inmates from their cells to the medical clinic for glucose checks. Consistent with clinic policy which precluded more than four inmates at a time in the clinic for glucose testing, plaintiff occasionally had to wait outside the clinic, usually for no more than a few minutes.

25. During the winter, inmates are issued coats and gloves.

26. On February 18, 2009, plaintiff refused a blood draw to measure his A1c levels. Plaintiff was counseled by Medina in the importance of blood sugar checks and on March 6, 2009, complied. His A1c level had increased to 9.1, indicating poor diabetes control.

27. Plaintiff met with a dietician on March 25, 2009, for education on weight control, diet, and exercise. Based on plaintiff's canteen purchases, which showed that he was purchasing high-sugar foods such a cherry pie, marshmallow treats, and cookies, plaintiff was counseled on the importance of complying with medication and glucose testing.

28. By December 2009 plaintiff's A1c level had reduced to 7.0 and remained low through 2010.

29. Plaintiff received yearly diabetic ophthalmology screening while at HDSP.

30. Plaintiff's diabetes was difficult to control because plaintiff sometimes refused treatment.

Diet

31. Upon arrival at HDSP, plaintiff was initially served the "Heart Healthy Diet," which uses no peanut oil and is designed for patients with hypertension.

32. In March 2010 plaintiff's creatinine levels had increased and routine testing revealed early indications of kidney disease. As a medical precaution, plaintiff's diet was changed in April 2010 to the "Renal.Pre-Renal Diet."

In opposition to summary judgment, plaintiff provides various portions of his prison file, including medical records, as well as his own declarations.

/ / /

/ / /

/ / /

5

## II. STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

### III. DISCUSSION

This action proceeds on plaintiff's claims that defendants' conduct violated his rights under the Eighth Amendment to adequate health care. Defendants each argue, among other things, that plaintiff cannot establish necessary elements of his claims and that they are entitled to judgment in their favor as a matter of law.

///

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind."  See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

///

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

The undisputed evidence in this case establishes that plaintiff cannot prevail on his Eighth Amendment claims against defendants. As to showers, the evidence reveals that his once-a-day shower schedule was honored when plaintiff first arrived at HDSP and was only discontinued after plaintiff failed to take the necessary steps to have his daily shower authorization continued. Plaintiff has not provided any evidence that any defendant discontinued daily showers for the purpose of denying plaintiff appropriate medical care with respect to hygiene.

Similarly, with respect to footwear, the evidence shows that plaintiff initially had an authorization for specific orthopedic boots, not athletic shoes. This authorization was broadened to include athletic shoes to accommodate plaintiff's complaints of foot pain. Plaintiff has not presented any evidence that any defendant denied him medically necessary footwear.

As to plaintiff's diabetes and dietary needs, the undisputed evidence shows that, contrary to plaintiff's contentions, defendants followed plaintiff's condition closely and provided appropriate medical care, including dietary counseling. The evidence also shows that plaintiff's diet was changed for medically indicated reasons. Plaintiff has not presented any evidence to show that any defendant was deliberately indifferent with respect to plaintiff's diabetes or diet.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' motions for summary judgment (Docs. 57 and 60) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 5, 2013

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE